UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
L.L., an infant, by M.R. and G.L.,

                       Plaintiff,

              -against-

Massapequa Union Free School District,

                     Defendant.
-------------------------------------------------------------------X

**COMPLAINT**
**ECF Case No. 25-cv-5780**

Plaintiffs M.R. and G.L., individually and on behalf of their son, L.L., by their attorney, Thivierge & Rothberg, P.C., as and for their Complaint, hereby alleges and states the following:

## PRELIMINARY STATEMENT

1. Plaintiffs M.R. and G.L., individually and on behalf of their child, L.L., bring this action pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, the pertinent implementing regulations promulgated under the Code of Federal Regulations, § 300.342, *et seq.*, Article 89 of the New York State Education Law, Section 504 of the Rehabilitation Act of 1973, and Part 200, *et seq.*, of the Commissioner of Education's Regulations, against the Defendant, the Board of Education of the Massapequa Union Free School District ("District").

2. M.R. and G.L. seeks review and reversal of State Review Officer ("SRO") Justyn P. Bates' Decision dated June 20, 2025[1] ("SRO Dec."), which upheld Impartial Hearing Officer ("IHO") Vanessa M. Gronbach's Findings of Fact and Decision dated October 29, 2024[2]

---

[1] A true copy of the SRO Decision, *Application of a Student With a Disability*, Appeal No. 24-605 is annexed hereto as Exhibit A.

[2] A true copy of the IHO Decision for this matter is annexed hereto as Exhibit B.

("IHO Dec."). The IHO and SRO Decisions erroneously found that the District offered L.L. a free and appropriate public education ("FAPE") for the twelve-month 2022-2023 school year (July 2022 – June 2023), and denied M.R. and G.L.'s request for tuition and transportation reimbursement for L.L.'s placement at The ELIJA School ("ELIJA").

3.   L.L. presents with severe Autism Spectrum Disorder ("ASD")(Level 3 –requiring very substantial intervention), auditory processing disorder, anxiety, and Attention Deficit Hyperactivity Disorder ("ADHD"). He required an intensive Applied Behavior Analysis ("ABA") program for the 2022-2023 school year ("22-23 SY") to address his ASD and severe maladaptive behaviors.

4.   For the 22-23 SY, the District assigned L.L. to attend a non-ABA 8:1:4 special class with a 1:1 aide. This program did not address L.L.'s needs in the 2021-2022 school year ("21-22 SY") and could not address his worsening behavioral and individual special education needs for the 22-23 SY.

## JURISDICTION AND VENUE

5.   This Court, pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. § 1331, and 28 U.S.C. § 1367, has jurisdiction over this action without regards to the amount in controversy.

6.   Venue is proper pursuant to 28 U.S.C. § 1394(b) in that Plaintiffs M.R., G.L., and L.L. and the Defendant District all reside in or are situated within this judicial district.

## THE PARTIES

7.   M.R. and G.L. and their son L.L. are not expressly named herein by their given names, or further identified by their actual addresses within the Eastern District of New York, because of privacy guarantees provided in the IDEA, as well as in accordance with the Family Educational Rights Privacy Act ("FERPA"), 20 U.S.C. § 1232(g); 34 C.F.R. § 99.

8. At all relevant times pertaining to this action, M.R., G.L., and L.L. were and are residents of the State of New York in Nassau County, residing at an address within the boundaries of the District.

9. Defendant, the District, upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the agency charged with the obligation to provide L.L. with a FAPE in accordance with IDEA mandates.

### RELIEF BEING SOUGHT

10. Plaintiffs seek a determination that (a) the District failed to provide L.L. with a FAPE for the 22-23 SY; (b) L.L.'s placement at ELIJA was appropriate for him; (c) equitable considerations support M.R., G.L., and L.L.; (d) the District should reimburse M.R. and G.L. for L.L.'s tuition at ELIJA and associated transportation expenses; (e) L.L. is entitled compensatory services; and (f) M.R., G.L., and L.L. are entitled to any other, further, and different relief the Court deems appropriate under the circumstances.

11. Pursuant to the IDEA and New York State Education Law, all school districts within New York State are required to offer eligible students with disabilities educational programs tailored to meet these students' individual needs, and to provide each such student with a FAPE through an Individualized Education Program ("IEP"). Parents have separate statutory entitlements that are tied directly to their child's right to receive a FAPE. The FAPE requirements under the IDEA and the New York State Education Law are different for each child, and a "one size fits all" approach is not accepted. *F.L. v. Bd. of Educ. of Great Neck U.F.S.D.*, 274 F. Supp. 3d 94, 110 (E.D.N.Y. 2017), *aff'd sub nom. F.L. v. Bd. of Educ. of Great Neck Union Free Sch. Dist.*, 735 F. App'x 38 (2d Cir. 2018)*, (citing Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 859 (6th Cir. 2004)).

12.  A District may be ordered to reimburse a Parent for private educational expenses obtained for a child if the District's services were inadequate or inappropriate ("Prong I"), the services selected by the Parent were appropriate ("Prong II"), and equitable considerations support the Parent's claims ("Prong III"). *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359 (1985); *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

13.  The Supreme Court has found that Congress intended for such reimbursement to be available as a remedy for parents when the school district failed to offer the student a FAPE. "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance," had the District offered the student a FAPE. *Burlington*, 471 U.S. at 370-71.

14.  In New York State, there is a two-tier administrative due process review. A parent who believes that an IEP is insufficient may challenge it at a hearing before an IHO. 20 U.S.C. § 1415(f); N.Y. Educ. L. § 4404(1)(a). "At that hearing, the school district has the burden of demonstrating the appropriateness of its proposed IEP." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003). The IHO's decision may be appealed to an SRO, and the SRO's findings may in turn be challenged in either state or federal court. *Id.* at 380 (*citing* 20 U.S.C. § 1415(g), (i); N.Y. Educ. L. § 4404(2)); *see also* N.Y. Educ. L. § 4404(1)(c).

15.  The District Court "conducts a 'modified de novo' review of the administrative proceedings," and is charged with making an independent decision based on the preponderance of the evidence developed at the administrative proceedings, and any other evidence presented by the parties. *See M.N. v. N.Y. City Dep't. of Educ.*, 700 F.Supp.2d 356, 363-364 (S.D.N.Y. 2010); *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119,

122-123 (2d Cir. 1998). The Court does not "rubber stamp" administrative decisions, but rather, is expected to give "due weight" to the factual determinations made during the state administrative process. *Walczak,* 142 F.3d at 129; *see Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982). The Court has "broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education where a school district fails to provide a FAPE." *Forest Grove School Dist. v. T.A.,* 557 U.S. 230, 239 (2009).

16.    In an action involving rights provided by IDEA, the District Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see M.S. v. N.Y. City Dep't of Educ.,* 231 F.3d 96, 102 (2d Cir. 2000).

## FACTUAL BACKGROUND

17.    At the start of the 22-23 SY, L.L. was seven-year-old student with a disability, whose IEP classifies him as having Autism. Ex. F, p. 1. As noted, L.L. is diagnosed with ASD Level 3 – requiring very substantial intervention, auditory processing disorder, anxiety, and ADHD. Tr. 4030, 4181; Exs. G, F, J, L.

18.    L.L. has a history of maladaptive behaviors, including unsafe behaviors such as pica (mouthing or eating non-food objects), eloping from his classroom, and aggression, and disruptive behaviors such as jumping out of his seat, crying, and dropping to the floor. Ex. 3, p. 5; Tr. 119, 418, 540, 829, 875, 878, 1030, 3003, 4184, 4187-88, 4191-92, 4197-99, 4218, 4240. L.L.'s aggression was seen in the classroom, such as kicking his aide or hitting his teacher, and was particularly unsafe in the home as he would continuously attempt to attack his younger brother. Tr. 3003, 4192, 4217-19, 4240.

19.  L.L. began attending a full day ABA program at Hagedorn Little Village at the age of 2 pursuant to Early Intervention recommendations. Tr. 4181-82. When he transitioned to the District's preschool caseload, he was placed at the Barbara C. Wilson preschool, another full day ABA program. Tr. 4182. At that time, his pediatric neurologist noted L.L. was displaying "severe symptoms" of ASD; L.L. was recommended to receive 10-15 hours of home-based ABA services in addition to a full day ABA program. Tr. 4182-83.

20.  ABA is an intensive therapy that involves breaking down activities into discrete tasks and rewarding a child's accomplishments. *See R.E. v. N.Y. City Dep't of Educ*., 694 F.3d 167, 176 (2d Cir. 2012). Many courts have held that students with ASD require programs utilizing ABA. *See e.g., A.M. v. N. Y. City Dep't. of Educ.¸* 845 F.3d 523, 545 (2d Cir. 2017); *C.F. v. N.Y. City Dep't. of Educ*., 746 F.3d 68, 81 (2d Cir. 2014); *M.H. v. N.Y. City Dep't of Educ*., 685 F.3d 217, 2252 (2d Cir. 2012); *R.E.,* 694 F.3d at 194; *W.S. v. City Sch. Dist. of City of N.Y*., 188 F. Supp. 3d 293 (S.D.N.Y 2016).

21.  In the 2020-2021 school year ("20-21 SY"), L.L. transitioned into kindergarten and the District placed him in a non-ABA program for the first time, an 8:1:4 special class. Tr. 4183. In this program, L.L. displayed maladaptive behavior such as jumping out of his seat, crying, dropping to the floor, and physical aggression towards peers and objects. Ex. 3, p. 5; Tr. 119, 4184.

22.  L.L. did not display aggression prior to transitioning into the non-ABA 8:1:4 special class for the 20-21 SY. Tr. 4184. District staff reported that L.L.'s behaviors at times appeared to occur without cause. Ex. 3, p. 5. At other times, he could be set off by something as minor as a spill or mess in the classroom, or the perception that a peer was not following rules. *Id*.

23. Notwithstanding these serious behavioral concerns, the CSE continued the same recommendation in an 8:1:4 special class for the 21-22 SY, L.L.'s first grade year. Ex. 3.

24. In 21-22, L.L.'s aggressive outbursts became an increasing concern to his teacher and parents. Tr. 540, 4187-88.

25. L.L. became fixated on people entering or exiting the classroom, leading to maladaptive behavior and an inability to attend to instruction. Tr. 691, 850, 2988-89; Ex. 25, p. 3. L.L. would frequently become dysregulated when a preferred adult would leave the classroom, leading him to "raise his voice and yell out" or become physically aggressive. Tr. 110. The parents sought an evaluation from Dr. David Marks, Ph.D. in January of 2022 (Ex. L) because L.L.'s "deteriorating behaviors … were adversely impacting his ability to access instruction." Tr. 2651, 2657.

26. In November 2021, M.R. and G.L. had a call with District staff about L.L.'s behavioral issues. The call included L.L.'s teacher Samantha Montanino; Kate Carmody, the new consultant behaviorist for the District; and Michael Verini, District psychologist at L.L.'s District placement. Tr. 4187-88. L.L.'s parents learned that L.L.'s maladaptive behaviors were worse than they had been informed, including disruptive behaviors such as crying spells of up to an hour, sometimes multiple times a day. Tr. 4188. These behaviors began to occur at home as well. Tr. 4188-89.

27. By December 2021, L.L. was having incidences of crying and aggression in school "every day, multiple times a day." Tr. 4191-92. Ms. Montanino testified that the Ms. Carmody's visits to the classroom had to increase due to L.L.'s behaviors. Tr. 860. Mr. Verini also testified that he was often called into the classroom to support L.L. in 21-22 when L.L.'s dysregulation was "manifesting in some maladaptive or unsafe behaviors." Tr. 124. In fact,

he was called into L.L.'s classroom for behavior and crisis support every other day, sometimes more than once per day, significantly more than the time he saw L.L. in his prescribed counseling sessions. Tr. 409, 411, 419.

28. In January and February 2022, L.L.'s parents were repeatedly informed that L.L.'s known maladaptive behaviors were increasing and new maladaptive behaviors were surfacing: in addition to aggression against one specific student, he was now hitting adults and children and trying to make himself throw up. Tr. 4197, 4219. Additionally, he started displaying unsafe behaviors such as trying to eat inedible objects and trying to elope both from the classroom and from the school. Tr. 4199, 4218. On multiple occasions he attempted to run into the street as he transitioned out of the school each day. Tr. 4221.

29. As L.L.'s parents became increasingly concerned, they reached out to an educational consultant/NYS certified school psychologist, Karen Bottalico, SAS, SDA, who recommended that they seek private evaluations in addition to the ones done by the District. Tr. 4203-4208.

30. Over the fall of 2021 through winter of 2022, L.L. was evaluated by psychiatrist Dr. Karen Burkhard, M.D., audiologist Dr. Donna Geffner, Ph.D., CCC-SLP/A, and neuropsychologist Dr. David Marks, Ph.D. *See* Exs. J, K, L.

31. Dr. Burkhard conducted a psychiatric evaluation of L.L. on December 1, 2021, which included a review of records (including an Achenbach Scales questionnaire completed by L.L.'s teacher and parents) and a mental status examination. Ex. J; Tr. 4016-18, 4021-24, 4027-28, 4094. Dr. Burkhard's report reflects that teachers reported L.L. was "highly restless, distractible and prone to quick and drastic mood changes." Ex. J, p. 1. He was impulsive, perseverative, self-stimulatory, and demonstrated maladaptive behaviors. *Id*.

8

During her evaluation, L.L. was very self-involved and restless and displayed variable eye contact. Ex. J, p. 2. His dexterity, balance, and strength were also impaired. Ex. J, p. 3. Overall, Dr. Burkhard concluded that L.L. demonstrated poor relatedness, sensory defensiveness, impaired speech, fine and gross motor skills deficits, impulsivity, restlessness, distractibility, anxiety, obsessiveness, avoidance, and reactive behaviors. *Id.* Therefore, she recommended, *inter alia*, that L.L. be placed in a highly-structured full time 1:1 ABA program with highly trained staff supervised by a Board-Certified Behavior Analyst ("BCBA") with additional home ABA programming. *Id.*

32. L.L. underwent testing with Dr. Marks in January and February 2022. Ex. L. Dr. Marks is a licensed clinical Psychologist and Associate Professor with NYU Langone Health/NYU Child Study Center. Tr. 2639-42.

33. Dr. Marks' testing of L.L.'s social and behavioral skills demonstrated L.L. regressed between 2020 and 2022. Dr. Marks administered the Behavioral Assessment for Children, 3rd Edition ("BASC-3") to gain insight into the magnitude and severity of L.L.'s "behavior, in areas of emotional functioning, social functioning and development adaptive functioning." Tr. 2693. Dr. Marks administered the BASC-3 with the parents and Ms. Montanino. Ex. L, pp. 7-8. Both parents and Ms. Montanino rated L.L.'s hyperactivity, atypical behaviors, and withdrawal to be clinically significant, meaning there were significant concerns with aggression, anxiety, and depressive symptoms. Tr. 2694-95, Ex. L, p. 8. There were also significant concerns related to L.L.'s ability to self-regulate and around the fact that he was "struggling to engage with others." Tr. 2696. These scores represent a regression from the District testing using the BASC-3 in 2020, which also completed by Ms. Montanino. *See* Ex. 13, pp. 7-8. Ms. Montanino rated L.L. in the average

range for Hyperactivity in 2020, as compared to clinically significant in 2022. *Compare* Ex. 13, p. 7 *and* Ex. L, p. 8. Similarly, she had rated his atypical behaviors, withdrawal, and attention problems to be in the at risk range in 2020, and these behaviors all worsened to the clinically significant range in 2022. *Id*. His social skills, adaptability, and functional communication skills all fell from the average range into the at risk range. *Id.* The IHO and SRO both failed to contend with these score regressions, and the District produced no testimony casting doubt on these scores.

34.    Dr. Marks and Ms. Montanino agreed that L.L.'s academic functioning was far below grade level in all areas. Tr. 4026, Exs. J, p. 1; L. On the Kaufman Test of Educational Achievement, other than in "oral reading of single words" where L.L. scored in the 12th percentile (below average), his scores in every other tested domain fell between the 0.1 percentile and the 5th percentile, placing him in the low to very low range. Ex. L, p. 6. L.L. was "functioning far below grade level in all academic areas in …[the] ungraded 8:1:4 program," (Ex. J, p.1) and failed to make any meaningful academic progress.

35.    Dr. Marks and Ms. Bottalico both observed L.L. in the school setting, and told L.L.'s parents that the current educational setting was inappropriate for L.L. *See* Tr. 2986-91, 2993, 4139, 4208-09.

36.    Dr. Marks reported that L.L. was a "behavioral outlier in that classroom" and told L.L.'s mother that he was "deeply unsettled" by what he saw and "did not feel right leaving [L.L.] there" at the end of his observation. Tr. 4208-09.

37.    In the District program, according to district witnesses, "a majority of the time, [L.L.] was displaying signs of either being upset, frustrated or angry." Tr. 415 (emphasis added).

38.    Concerned by the testing results and reports of L.L.'s worsening behavior, M.R. researched

and considered a number of ABA programs, including ELIJA. Tr. 4210-12.

39. On Monday, March 21, 2022, Alyssa Brusca began working in the District, and was assigned to L.L.'s classroom. Tr. 968.

40. Ms. Brusca appears to have immediately been concerned about L.L.'s behaviors: she requested that a new Functional Behavior Analysis ("FBA") be conducted in her first week working with L.L. *See* Tr. 1031; Ex. 23, p. 1. Ms. Carmody's report concurring with this recommendation (which she purportedly signed on Sunday, March 20, 2022) notes that the recommendation was made in the week of March 21, 2022. Ex. 22, p. 4.

41. In April 2022, the CSE convened to develop an IEP for the 22-23 SY. Tr. 4234; Ex. C. Dr. Marks, Dr. Burkhard, Dr. Geffner, and Ms. Bottalico all participated in the meeting and shared their findings and recommendations. Ex. C, p. 2; Tr. 712, 733, 2997-98, 4234-35, 4237-39, 4244. L.L.'s parents raised the concerning behaviors they were seeing at home, including L.L. attacking his younger brother, his inability to be in a car, hysterics when his mother tried to leave the house, as well as behaviors they saw L.L. demonstrate when they visited school events – and felt like all of their concerns were "very severely downplayed." Tr. 710, 712, 2997-98, 3000, 3010-12, 4231-32.

42. L.L.'s teacher acknowledged during the meeting that L.L. had behaviorally regressed in her classroom, and the CSE was told that L.L. would begin "kicking and screaming" when an aide tried to stop him from eloping from the classroom. Tr. 3003, 4240.

43. Based on the recommendations of Drs. Marks and Burkhard and Ms. Bottalico, L.L.'s parents asked that L.L. be placed in a 1:1 ABA program, rather than the eclectic non-ABA in-District program where L.L. was attending and regressing. Exs. J, L. Notwithstanding L.L.'s behaviors and the expert recommendations, District rejected the parents' request, and

recommended that L.L. remain placed in the eclectic non-ABA 8:1:4 special class for the following year with the addition of a 1:1 aide. Ex. C; Tr. 712, 4245-46. The parents were open-minded to considering any school program, but the District refused to consider anything but its in-District program. Tr. 4249, 4278, 4313.

44. A second CSE meeting was held on June 17, 2022, to discuss the results of the recent FBA. Ex. 34; Tr. 4246. Again, the parents asked the district to consider a 1:1 ABA program for L.L. for the 22-23 SY. Tr. 4245-5246. The District inaccurately asserted that its 8:1:4 special class was equivalent to a 1:1 ABA program because it offered an aide, (Tr. 4246) ignoring the seismic difference between a 1:1 ABA program with behavioral and academic programming developed and supervised by a BCBA, and an 8:1:4 classroom where the only 1:1 support would be provided by a minimally-trained aide.

45. The District did offer an increase in home ABA services. The home-based services were 1:1 ABA in recognition that 1:1 ABA is the model necessary for children with ASD presenting with behaviors like L.L.'s. Tr. 4247-48. The parents told the District they would consider the program recommendation for the following year, but also asked the District to consider ELIJA. Tr. 4249-50. Again, the District refused. *Id.*

46. By letter dated June 24, 2022, the parents expressed their concerns about the District's recommended program and placement, and provided notice to the District that subject to an appropriate placement by the District, they intended to send L.L. to ELIJA for the 22-23 SY, and look to the District for reimbursement/direct funding for the tuition, costs, and expenses of L.L.'s program there (including all services). Ex. Y. They also requested special education transportation (while reserving the right to seek reimbursement for any transportation costs or expenses) and home ABA, supervision, and parent training. *Id.*

47. The CSE reconvened in August 2022, after the start of the 22-23 SY, to discuss the Behavior Intervention Plan ("BIP") that was drafted and the parents' notice to the district that they had placed L.L. at ELIJA. Tr. 4251. The executive director of ELIJA, Dr. Monica Howard, BCBA-D, LBA, presented to the CSE on L.L.'s presentation and the progress he had made in the short time he attended ELIJA. Tr. 4252; Ex. HH. The parents asked the CSE to re-consider the recommended placement for the 22-23 SY, and once again, were refused without meaningful consideration. Tr. 4254, 4258. The parents elected to keep L.L. at ELIJA for the 22-23 SY, and on October 26, 2022, filed a Due Process Complaint. Ex. A.

48. Following an impartial hearing, IHO Gronbach issued an erroneous decision finding the District offered L.L. a FAPE. IHO Gronbach's October 29, 2024, IHO Decision was conclusory; was not supported by the record or law; misstated the record; failed to reconcile conflicting testimony and evidence; and failed to address several significant issues.

49. L.L.'s parents timely appealed to the State Review Office ("SRO"). Unfortunately and erroneously, the SRO dismissed the appeal, repeated the IHO's errors, improperly relying on the District's witnesses and evidence without meaningful consideration of the parents' evidence and experts.

## LEGAL CLAIMS

50. The SRO Decision is not supported by testimony, evidence, or applicable law and review standards. The SRO failed to engage in a thorough and careful review of the testimony and evidence in the record, and the SRO Decision should not receive deference here.

51. Moreover, the SRO Decision does not turn on educational expertise such that deference is warranted. *De novo* review compels a finding that the District denied L.L. a FAPE.

52.  The District failed to develop a procedurally and substantively appropriate IEP for L.L., which was calculated to enable him to receive educational benefits, for the 22-23 SY.

53.  L.L. required a 1:1 ABA program to progress, and the District failed to make a recommendation for such a program.

54.  Most fundamentally, the SRO ignored objective, measurable evidence showing that L.L. regressed in the District's 21-22 SY program, which was effectively the same as that recommended for 22-23. SRO Dec., p. 31.

55.  The District's failure to consider or recommend 1:1 ABA programming denied L.L. a FAPE. *See C.F.*, 746 F.3d at 81 (finding that failure to recommend a 1:1 ABA program for a student with serious maladaptive behaviors resulted in FAPE denial).

56.  The "content, methodology, or delivery of instruction" to students with disabilities must be "narrowly tailored to address the unique needs of the child that result from the child's disability." *A.M.,* 845 F.3d at 541 (*citing* 34 C.F.R. § 300.39(b)(3)(i)).

57.  The SRO mischaracterized evidence regarding the consensus of expert recommendations that L.L. required 1:1 ABA. "[W]hen the reports and evaluative materials present at the CSE meeting yield a clear consensus, an IEP formulated for the child that fails to provide services consistent with that consensus is not reasonably calculated to enable the child to receive educational benefits." *A.M.,* 845 F.3d at 542-45; *W.S. v. City Sch. Dist. of City of N.Y.*, 188 F.Supp.3d at 305.

58.  "Although courts should generally defer to the state administrative hearing officers concerning matters of methodology, [an] SRO's failure to consider any of the evidence regarding the ABA methodology and its propriety…is more than an error in the analysis of proper educational methodology. It is a failure to consider highly significant evidence in

the record. This is precisely the type of determination to which courts need not defer." *M.H. v. New York City Dep't of Educ.*, 685 F.3d at 252; *see W.S.*, 188 F.Supp.3d. at 305.

59.    The SRO lists 16 reports in its decision that it alleges were considered at the April 2022 CSE, and makes conclusions based on "a review of this evidence." SRO Dec., p. 37.

60.    However, the SRO does not appear to have reviewed "this evidence."

61.    It is impossible for the SRO to have reviewed all of the 16 reports listed as not all 16 were included in the evidence disclosed at the administrative hearing. The list mentions at least three reports that were not included in evidence, including a "March 2022 report card," a "March 2022 parent counseling and training progress report", and a "March 2022 behavior intervention progress report (home-based services)." SRO Dec., p. 37. The District submitted only an end of year 21-22 SY Report Card into evidence, not the March Report Card allegedly considered at the April CSE. *See* Ex. 32. No home behavior intervention progress report was submitted, and the only parent training progress report submitted was from June 2022 (which was written by a provider who only started working with the family in May and could not have drafted a March report). *See* Ex. 26.

62.    Its 16-item list is copied directly (in reverse order) from the District's April 2022 Prior Written Notice ("PWN") but for the omission of the parents' private reports. Ex. 9, p. 2. This presumably accounts for the SRO's inaccurate titles for these documents: for example, the SRO lists a January 2022 "behavioral support plan," just like the PWN, when the actual document is titled a "Behavior Modification Plan." *See* SRO Dec., p. 37; *see also* Exs. 9, 33.

63.    In fact, the SRO cites to only 15 exhibits in total[3] following this list of 16 reports. Two of these 15 cited exhibits (a 20-21 Goal Progress Report (Ex. 29) and a February 2021 Progress Report (Ex. 30)) are not among the 16 listed by the SRO nor on the April PWN.

64.    Following this list, the SRO claims that its "review of this evidence demonstrates" that "only" the reports by Dr. Marks and Dr. Burkhard recommend 1:1 ABA instruction for L.L. SRO Dec., p. 37. However, this is misleading as none of the cited District reports make any recommendations at all.[4] *See* Exs. 12-14, 19-25, 29-31, 33. Several of the District reports evasively state that recommendations will only be made by the CSE team. *See, e.g.,* Exs. 20, p. 3; 24, p. 2). The SRO's conclusion on this point is legally unsound. If the evaluative materials before the CSE recommend a particular methodology, there are no other evaluative materials before the CSE that suggest otherwise, and the school district does not conduct any evaluations "to call into question the opinions and recommendations contained in the evaluative materials," then, according to the Second Circuit, there is a "clear consensus" that requires that the methodology be placed on the IEP. *A.M. v. New York City Dep't of Educ.*, 845 F.3d at 544-45. The fact that some reports or evaluative materials do not mention a specific teaching methodology does not negate the "clear consensus" *R.E.,* 694 F.3d at 194.

65.    The SRO improperly relies on the District's seeming-refusal to allow its experts to make any recommendations in writing to argue that they did not agree that L.L. required 1:1 ABA.

---

[3] Other than the parents' private reports, which are specifically exempted from the 16 item list other than a private occupational therapy evaluation. SRO Dec., p. 37; Ex. 15.

[4] Exhibit 25, a progress report from Ms. Montanino, contains a section titled "Recommendations," but it does not include any recommendations, and refers to a student by a different name than L.L. Ex. 25, p. 3.

This also ignores that the District attempted to claim at hearing that it would have effectively been providing ABA, an implicit acknowledgement that this is what L.L. required.

66. L.L.'s in-District's occupational therapist, Allison Leykamm, noted that while in the 8:1:4 classroom "[L.L.] was distracted by environmental stimulation and required redirection often," and she found him frequently emotionally dysregulated there, in the 1:1 setting of her therapy room he did not have these challenges. Tr. 1681-82.

67. The SRO also relies on selected March 2022 exhibits and testimony to claim that L.L. was progressing in the District's non-ABA 8:1:4 special class, while ignoring that other contemporaneous reports noted that L.L.'s behaviors were worsening. SRO Dec., pp. 37-38. Reports from both District behaviorists in March 2022 recommend a new FBA be conducted "due to the increasing trends and higher rates of target behaviors" including "aggressive behaviors towards staff, mouthing inedible objects, non-contextually laughing, and attempting to elope from the classroom." Exs. 22, p. 4; 23, p. 1.

68. The SRO also failed to fully review the evidence from L.L.'s private evaluations. For example, the SRO claims that Dr. Burkhard did not "administer any assessments or evaluations," disregarding that Dr. Burkhard, as a psychiatrist, conducted a mental status evaluation in addition to having L.L.'s parents and teacher complete a psychometric questionnaire. SRO Dec., p. 4 fn. 5; Ex. J; Tr. 4016-18, 4021-24, 4027-28, 4094.

69. The SRO mischaracterizes testimony from M.R. that L.L.'s behaviors got better and "stopped." SRO Dec., p. 4 fn. 5. M.R. testified that L.L.'s behaviors stopped in kindergarten – not in the subsequent school years at issue. Tr. 4186.

70. The SRO ignored the District's failure to recommend in its IEP that an ABA expert work directly with L.L. at school. Ex. 5, pp.16-17. Dr. Burkhard noted that "the school was doing

the best that they could, apparently…and L.L. was falling…was not keeping up and was not progressing adequately." Tr. 4033-34. Therefore, she testified, L.L. required " a 1:1 ABA program with intensive intervention [which] was based on [her] experience with children like [L.L.] and what they really need into order to thrive and progress…1:1 behavioral intervention working in establishing, improving skills but also eliminating the negative behaviors that interfered with his skills acquisition." Tr. 4034; *see* Ex. J.

71.   A 1:1 teaching assistant ("TA") "wasn't appropriate" for L.L. Tr. 3260. In adding a TA for 22-23, the District acknowledged that L.L. needed 1:1 support in order to meaningfully access the academic environment, but failed to recommend he receive instruction from a provider with the expertise in ABA that L.L. requires to make both behavioral and academic progress. The proposed IEPs fail to note the qualifications or responsibilities of the proposed TA. *See* Exs. 5, 6.

72.   Dr. Howard, an expert in the field of ABA, testified that L.L. "needed someone who was fully trained in behavior analysis" or at least "a registered behavior technician, someone who can fluently apply the science of behavior analysis." Tr. 2988, 3022, 3260-61, 3263.

73.   Like the IHO, the SRO failed to grapple with the testing by Dr. Marks and Dr. Burkhard. *See F.O. v. N.Y. City Dep't of Educ*., 976 F.Supp.2d 499, 514 (S.D.N.Y.2013)(deference not merited where fact-finder "failed to analyze conflicting testimony from any of the Parents' witnesses"); *C.L. v. N.Y. City Dep't of Educ*., No. 12 CIV. 1676 JSR, 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013), *aff'd*, 552 F. App'x 81 (2d Cir. 2014)(deference not merited where factfinder "gave no explanation for why it credited the unfounded assertions of a school psychologist who had observed [the student] for only an hour and a quarter over the cogent testimony of multiple highly credentialed teachers who had worked closely with [the

Student] for a full school year"); *M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 161 (S.D.N.Y. 2010) ("The SRO's decision on this point does not warrant deference because the SRO improperly excluded Plaintiffs' substantial methodology evidence, which tended to show that [the child] required a methodology employing a 1:1 student-teacher ratio.").

74.  The SRO also improperly disregarded evidence that the District program could not provide ABA instruction, and that given L.L.'s regression in a similar 8:1:4 special class in the previous school year, he could not progress in this class size in the 22-23 SY.

75.  The SRO failed to analyze District evidence that L.L. was not progressing and that District staff were not appropriately evaluating L.L.'s skills. For example, Ms. Montanino testified that she marked L.L. as having achieved Goals even though he could not perform the goals independently; he still required prompting, because "minimal prompting to me is kind of like right where I expect them to be," even though this was not specified in the IEP Goals. Tr. 771; Ex. 28, p. 3; 32, p. 1. Further, some proposed Goals called for L.L. to achieve success while receiving prompting, rather than to independence, both implying that independence was not being sought and that had prompting been intended to be included in the other Goals, it would have been explicitly listed. Ex. 5, pp. 12, 14; Tr. 939. Ms. Montanino also testified that when a Goal is allegedly mastered, she would not necessarily develop a new Goal targeting new skills, meaning L.L. would be wasting valuable instructional time. Tr. 917. Further, some Goals called for L.L. to demonstrate a skill only 67% of the times tested, far too low to demonstrate mastery. Tr. 915; 3003-04, 2404.

76.  The SRO improperly credited Ms. Montanino's claims that L.L. was progressing in light of L.L.'s test scores and his mother's testimony. For example, at a parent teacher conference, Ms. Montanino told M.R. that L.L. couldn't answer "any comprehension questions… And

a lot of the books that he's reading, he guesses a lot on the words based on the pictures." Tr. 4193. Being able to read aloud, but not comprehend makes someone a good decoder, not a good reader – comprehension is a key piece of reading. Moreover, research shows that students must be explicitly taught phonics rather than teaching them to guess the meaning of words or stories based on picture cues; teaching students to rely on cues such as pictures rather than sounding out words weakens their reading skills and makes it more difficult for them to learn to be proficient readers.[5] In addition, the District measured L.L.'s reading skills using a non-scientific and unreliable system. *See* Tr. 3002.

77.     There was no evidence presented by the District that L.L. had the ability to comprehend the texts he was decoding aloud. Even within the domain of sight words, Ms. Bottalico testified that she observed an aide working with L.L. and "the aide did not know how to utilize errorless [teaching] so I watched him make many errors…identifying…very basic sight words." Tr. 2988.

78.     Dr. Marks' testing showed that L.L. lacked many of the skills that the District asserted he had. His testing showed "evidence of prominent academic delay" in addition to the emotional deficits described *supra.* Tr. 2687. On the Clinical Evaluation of Language Fundamentals – Fifth Edition ("CELF-5"), L.L.'s performance was "really quite compromised" (Tr. 2688) – his scores placed him in the 0.4 to the 1st percentile in "dimensions of language comprehension, repetition and expression." Ex. L, pp. 5, 7. He also showed delays in the areas of receptive vocabulary. Tr. 2688-89; Ex. L, p. 7.

79.     The District's own testing confirmed that L.L.'s skills had deteriorated: Ms. Bottalico,

---

[5] *See, e.g.*, Emily Hanford, "At a Loss for Words: How a flawed idea is teaching millions of kids to be poor readers," APM REPORTS, August 22, 2019, at https://www.apmreports.org/story/2019/08/22/whats-wrong-how-schools-teach-reading.

reviewing L.L.'s psychological testing from preschool and comparing that to his triennial psychological assessment, noted that "L.L. as a preschool student in 2017 had average intelligence. He had an IQ score of 95 which was at the 37th percentile. The District's evaluation in 2020…[put his IQ] in the 2nd percentile. So, it really did reveal that there were degradation in his functioning abilities." Tr. 2981; Ex. 13, p. 4. There was a profound "shift in terms of his intellectual abilities over that interval of time." Tr. 2715. Dr. Marks testified that there was a "sizable drop off" in both his intellectual and adaptive abilities between the District's 2020 testing[6] and his testing in 2022. Tr. 2715-16; Exs. 13, L.

80.    Dr. Marks administered a "basic sight word identification assessment" (Tr. 2686) on which L.L. scored in the 12th percentile and showed that L.L. "was not able to yet identify…many sight words." Tr. 2686; Ex. L, p. 6. "His computational skills came out a standard score of 49, less than the .1 percentile." *Id*. Although the District floated a number of reasons that L.L.'s skills might not be demonstrated in a different setting, the reality is that if a skill is truly learned, then it can be generalized and should have been apparent in Dr. Marks' assessments. *See* Tr. 3171-72, 3001, 3004. Mastery of a skill involves employing it in varied settings and contexts.

81.    The SRO, like the IHO, relied extensively on a report from Ms. Montanino from March 29, 2022, which improbably claims that L.L.'s outbursts and aggression were minor. This report is in conflict with  simultaneous reports by Ms. Brusca and Ms. Carmody that L.L.'s behaviors were escalating in frequency and intensity such that a new FBA had to be conducted. Exs. 22; 23; 25, p. 3; IHO Dec., p. 73; SRO Dec., pp. 48-49. It was also written only a short time after Ms. Montanino emailed M.R. in February 2022 stating that L.L. had

---

[6] Dr. Marks misidentified this testing as being done in October 2020. Tr. 2715. The report on this testing was completed in November 2020. Ex. 13.

a "difficult time regulating himself, even with 1:1 adult support" and that he was "trying to hit people (adults and kids) when he was frustrated." Ex. AA, p. 3.

82. The IHO and SRO both inaccurately alleged the evidence showed that L.L. was successful with utilizing coping strategies taught in counseling. IHO Dec., p. 35; SRO Dec., p. 49 fn. 35.

83. Testimony at hearing established that the District did not measure L.L.'s ability to use these strategies in the classroom, only to identify these strategies in counseling with Mr. Verini. *See* Tr. 412; Exs. 3, p. 11, 21, p. 1.

84. The SRO did not consider issues raised showing that the District program could not collect or report data accurately, a crucial aspect of ABA. The District's contracted BCBA acknowledged that accurate data collection is an essential component of ABA, and that "if it wasn't for data collection, we wouldn't really know what to do next, so it really shows us if our procedures are working, if they're not working." Tr. 1002. Without proper data collection, there can be no ABA program.

85. District reports were filled with errors, including when it occasionally bothered to take scattershot data. This undermined any credibility in the District's ability to implement ABA principles with fidelity. Ms. Montanino's alleged goal progress data from the 21-22 SY lists data that was "collected" from L.L. on numerous dates when he was absent or when school was closed. *Compare* Ex. 69, pp. 2-3 *with* Ex. 70, pp. 2, 7, 9; Tr. 919-20. For example, Ms. Montanino's alleged "data" lists L.L. as having "achieved" one of his Goals based on data collected on February 3 and February 23, 2022 – dates he was not in school. *Compare* Ex. 69, p. 3 *with* Ex. 70, p. 2.

86. Reports from the District's consultant BCBAs were also rife with inaccuracies and misinformation. For example, Ms. Carmody's signature, dated March 20, 2022, (a Sunday) is found on a report discussing incidents occurring starting the next date, March 21, 2022 – the report itself is dated March 25, 2022. Ex. 22, pp. 1, 4-5. Ms. Brusca's report from the same time period is dated both March 25 and March 29. Ex. 23, pp. 1-2.

87. Ms. Carmody's data collection also provided an inaccurate picture of L.L.'s struggles because it did not include incidents when L.L. *attempted* aggression towards peers. For example, her notes mention that on February 7, 2022, L.L. "kept saying he was going to hurt [a peer] and lunging towards" that peer. Ex. 72, p. 10. However, because she was able to prevent him from successfully hurting that peer, her data collected that day misleadingly lists 0 attempts at grabbing others on a day when he made repeated attempts at aggression. Ex. 71, p. 12.

88. Similarly, Mr. Verini did not document his frequent classroom visits, nor did he document the varying duration of L.L.'s episodes. Tr. 185; 410. Ms. Montanino testified that L.L.'s tantrums "would last a long time." Tr. 737. Mr. Verini did not record any data related to frequency, duration, cause, or impact of interventions on his behavior, instead collecting data only about progress towards his coping skills goal during scheduled counseling sessions. Tr. 414. He acknowledged that he was only able to deescalate the behaviors working 1:1 with L.L. in "a quieter area…to give him a little bit of space" (Tr. 411) and that he consistently had to intervene with L.L. roughly every other day, and he could be called into assist L.L. more than once a day. Tr. 419, 432. He frequently encountered him yelling, crying, and displaying aggression, and he developed new maladaptive behaviors. Tr. 432-

33. What is apparent from looking at his time in the District's program as a whole is a "clear pattern of regression academically as well as intellectually and behaviorally." Tr. 3032.

89. Ms. Montanino did not know who was responsible for collecting behavior data, nor whether it was ever graphed. Tr. 865-66, 887, 889. Similarly, Ms. Carmody did not know whether data collected on L.L.'s academic programming was ever graphed. Tr. 1344.

90. Ms. Montanino was not formally trained in ABA and did not understand what ABA is, instead testifying she believed ABA was "a positive approach to teaching, a positive approach to dealing with behaviors." Tr. 564-65. As noted by the District consultant BCBA and Dr. Howard, ABA is the science of understanding how an individual person learns and why they learn certain things, using data and data analysis. Tr. 1002; 2286-2293.

91. As L.L. required placement in an ABA program and there was no appropriate data collection in the District program, it was impossible for the District to meet their burden of proving that the 8:1:4 was appropriate to meet L.L.'s behavioral needs. For example, the District attempted, but failed, to establish a behavioral program around door tickets – a strategy put in place to address L.L.'s distress at preferred adults leaving the room – but Ms. Montanino testified that nobody bothered to take any data on the door tickets (Tr. 930), completely undermining the teachers' ability to ascertain whether the program was helping or harming L.L. cope with the door issue. The absence of data also makes it impossible to ascertain whether a token board was a successful behavior intervention strategy – it's impossible to know as no data "specific to the token board" was taken, (Tr. 931) nor was any taken on the "take a break, take a breath" intervention that seems to have been a cornerstone of the District self-regulation plan for L.L. Tr. 942.

92.    Parents are "entitled to rely on the IEP's characterization of the services available to [the student] in deciding whether to place [the student] in a private school setting." *P.K. ex rel. S.K. v. N.Y. City Dep't of Educ.*, 526 Fed. Appx. 135, 140-41, 141 n. 8 (2d Cir. 2013) (teacher's testimony regarding supplemental classroom language instruction could not remedy a deficient IEP which failed to recommend sufficient individual language therapy). Therefore, "an IEP must be evaluated prospectively as of the time it was created." *R.E.*, 694 F.3d at 188.

93.    Given that there is nothing in the record of this case that would indicate that the District did or could collect data in compliance with the principles of ABA, L.L.'s parents had no reason to believe data would be appropriately collected and utilized going forward. They reasonably believed that the IEP was deficient and inappropriate.

94.    The 8:1:4 program was not a true ABA model, but rather an eclectic classroom approach incorporating several methodologies. Tr. 2993. Ms. Bottalico, who holds a Master's degree in ABA and has worked in the field for many years, testified that "for children on the spectrum, there is a lot of scientific research that says that when an eclectic approach is used that they actually don't benefit." Tr. 2965, 2967, 2995. Indeed, the Behavior Analyst Certification Board does not consider programs which use eclectic interventions to be providing ABA treatment, as eclectic programs have been proven in several studies to be less effective than ABA.[7] A child with Level 3 ASD who demonstrates the magnitude of interfering behaviors that L.L. does needs to be in an ABA setting that is based in discrete trials performed in a natural environment - in other words, a true ABA program. Tr. 2408-

---

[7] BEHAVIOR ANALYST CERTIFICATION BOARD, "Applied Behavior Analysis Treatment of Autism Spectrum Disorder: Practice Guidelines for Healthcare Funders and Managers: Second Edition" (2014), p. 19, https://www.bacb.com/wp-content/uploads/2017/09/ABA_Guidelines_for_ASD.pdf.

09, 2713, 2723, 3091-92, 4034.

95. The 8:1:4 classroom also used inappropriate methodologies when observed by Ms. Bottalico, such as having learning stations set up, "which is not an ABA technique. It's mostly a TEACCH methodology." Tr. 2987-88. Courts have upheld IHOs who have found that TEACCH is inappropriate for students with ASD who exhibit serious, self-directed behaviors, who therefore require 1:1 ABA. *See M.H.*, 712 F. Supp. 2d at 135, 160-63; *R.K. ex rel. R.K. v. New York City Dep't of Educ.*, 2011 WL 1131492, at *24 (E.D.N.Y. Jan. 21, 2011), *aff'd sub nom.*

96. Dr. Marks' observation records note that "none of [L.L.]'s instructors appeared to record data regarding his difficulties, and the structure of the classroom – particularly the absence of a structured ABA framework – appeared incompatible with his educational and social-emotional needs and yielded both safety concerns as well as negligible academic engagement and productivity." Ex. L, p. 11. Ms. Montanino conceded that her class did not provide structured ABA. Tr. 755-56. Ms. Brusca also testified that the 8:1:4 class  was "not…a strict ABA program." Tr. 1105.

97. Despite the testimony of experts, the SRO inappropriately credited positive testimony about the ABA allegedly provided in the District program in the 8:1:4 special class by a behaviorist agency owner, Nicole Iannarone. SRO Dec., p. 48. Ms. Iannarone observed L.L. in the District classroom on two occasions. Exs. 80, 81.

98. Evidence and testimony from the administrative hearing revealed that provider Ms. Iannarone's agency assigned to provide home ABA to L.L. and his family had forged L.L.'s parents' signatures on her timesheets and fabricated her hours on those timesheets. Tr. 4282-4288; *compare* Ex. 52 *with* Ex. CC; *see, e.g.,* Tr. 1977-78.

99. Ms. Iannarone did not have any processes or procedures in place to prevent this type of malfeasance (Tr. 1975-77): given her inability to supervise and manage her employees, the IHO and SRO's decisions to credit her testimony was improper.

100. Furthermore, Ms. Iannarone's April 1, 2022, observation report indicated that she observed L.L. on a day when he was supported by a TA, when Ms. Brusca was in the classroom, an extra BCBA was present, and when classroom supports were provided including priming (warnings for upcoming transitions), differential reinforcement (including a token board), and visuals (such as a first-then board and coping strategies card). Ex. 80. Despite these supports, much touted by the District as part of how they were successfully working with L.L., data collection for that day reflects that L.L. exhibited verbal outbursts 10 times and successful aggression 7 times – above his average for the preceding month of March and a prime example of the kinds of behavioral spikes that so concerned Ms. Brusca in March. *See* Exs. 22, p. 5; 71, p. 18.

101. The SRO improperly dismissed the District's failure to develop an appropriate BIP for L.L. for the 22-23 SY.

102. School districts must develop an FBA which provides detailed information about a student's problem behaviors, and a BIP which provides strategies to reduce those behaviors, for a student whose behavior impedes his or her learning. *See* 20 U.S.C. § 1414(d)(3)(B)(i); 8 N.Y.C.R.R. § 200.22(a)-(b). "[F]ailure to conduct an adequate FBA is a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all." *R.E.*, 694 F.3d at 190.

103. As noted, Ms. Brusca recommended conducting a new FBA for L.L. immediately after Ms. Brusca began working in the District in March 2022. *See* Tr. 968, 1031, 1244-45; Exs. 22, p. 4; 23, p. 1.

104. In fact, L.L.'s behaviors began escalating in November 2021, but no FBA was started until April 28, 2022, five months later. Tr. 418, 880, 1037, 2651, 2657; Exs. 34, 36.

105. Data collected for this FBA showed that L.L. had daily outbursts of physical aggression, defined as hitting, kicking, or grabbing others. Tr. 1041; Ex. 34, p. 2.

106. The SRO improperly dismissed evidence that baseline data about L.L.'s behaviors were inaccurately reported in the FBA, despite partially acknowledging the error. SRO Dec., p. 42. Dr. Howard testified that "the baseline data is everything. If you don't have accurate baseline data reported, then you …don't have any way to measure whether intervention is effective or not. And so, if the baseline data are reported inaccurately…then it's gonna be really difficult to know whether the intervention is effective or not." Tr. 3304-05.

107. The SRO mischaracterized the baseline data error as being confined to a "particular date," April 28, 2022, ignoring that this date was just one "example" due to page limitations. SRO Dec., pp. 40, 42.

108. Ms. Brusca inaccurately claimed in the FBA "Baseline Data" that L.L. demonstrated a high of 7 incidents of physical aggression a day for the period of April 28 through May 10, 2022. Ex. 34, p. 2.

109. Raw behavior data from Ms. Carmody notes 15 incidents of grabbing on April 28; 9 on May 3; 10 on May 5; and 13 on May 10. *Compare* Ex. 34, p. 2 *with* Ex. 71, pp. 21-23. Given that grabbing is part of the defined behavior of physical aggression on the FBA, the high of 7 incidents is incompatible with the data, not on one "particular date" but on four of the nine

dates recorded for the FBA. *See* Ex. 34, p. 2.

110. This also invalidates Ms. Brusca's claim that L.L. demonstrated an average daily frequency of one incident of physical aggression during the course of her FBA data collection. Exs. 34, p. 1; 36, p. 2; N, p. 2.

111. In fact, based on Ms. Carmody's data, L.L. displayed the behavior of grabbing others an average of 8.44 times per day during the FBA observation period. *See* Ex. 71, pp. 21-23. This was a steadily worsening trend as her report stated he displayed this behavior an average of 0.4 times per day in January, 1.6 times per day in February, and 3.5 times per day in March 2022. Ex. 22, p. 5.

112. It is impossible to create an effective BIP based on faulty FBA data. The FBA data are the foundation of the BIP: you cannot build a house on a faulty foundation and expect it to stand. Likewise, you cannot write a BIP based on faulty data and expect it to effectively address behavior. *See* Tr. 2313-14, 2317, 2321, 3305, 3298; Exs. 34, 36, 71.

113. A BIP must be based on the results of an FBA. 8 N.Y.C.R.R. 200.1(mmm).

114. Ms. Brusca, who developed the District BIP, did not know that a BIP must be based on an FBA nor understand the need to collect all necessary data before developing a plan. *See* Tr. 1130, 1135, 1137-38.

115. Progress towards L.L.'s BIP Goals could not have been accurately measured because Ms. Brusca testified that her long and short term Goals were based on measuring progress from L.L.'s baseline average frequency data. Tr. 1087-88. As the average frequency was *significantly* incorrect, it would be impossible to accurately measure L.L.'s progress (or lack thereof) towards those goals. *See* Exs. 35, p. 4; 36, p. 4.

116. The SRO credits the District's claim that its BIP was developed before the start of the 22-

23 SY based on its alleged report date of June 30, 2022. SRO Dec., p. 44.

117. However, as noted *supra* regarding Ms. Carmody and Ms. Brusca's March 2022 reports, the dates on the District's behavior report were not always consistent with the date when the report was actually finished or signed.

118. Ms. Brusca testified only to when she completed the BIP, not to when she sent it to the parents, and the District submitted only a September 2022 email from Ms. Brusca to the parents with the proposed BIP. *See* Ex. 38; *see also* Tr. 1089.

119. Ms. Brusca's BIP was revised in August 2022 to correct an error regarding the baseline data collection period, and the District submitted that version of the BIP with a signature dated August 9, 2022, into evidence. Ex. 36, p. 5.

120. The original BIP with the erroneous data collection period was submitted into evidence with no signature and no signature date. Ex. 35, p. 5.

121. The interventions prescribed on the BIP were the same interventions that failed to address L.L.'s maladaptive behaviors in the previous school year. Tr. 885; *see* Ex. 33. For example, L.L. was supposed to increase "practicing and using various coping skills" including asking for a break and taking deep breaths (Ex. N, p.1), all of which Mr. Verini testified he had been using with L.L., and which failed to help L.L. regulate his behavior and attend to the classroom. *See* Tr. 412. Although the BIP itself was theoretically new, there is nothing in the document that goes beyond what District staff testified was already being employed. The supports being provided were failing to address L.L.'s behaviors, and L.L.'s average number of aggressive behaviors per day was increasing while these supports were offered.

122. Despite asserting that it offered an ABA program, the District failed to develop a BIP adhering to ABA principles; most notably, data is only directed to be collected on the

frequency of behaviors, not on their duration, nor on antecedents or effectiveness of interventions employed to address them. Ex N, p. 5; *See* Tr. 2821-22, 3310-12.

123. Overall, the SRO ignored numerous indications that the proposed FBA and BIP were inappropriate, untimely, and insufficient to address L.L.'s needs.

124. The SRO ignored evidence of predetermination, claiming that "the hearing record is devoid of evidence demonstrating that any of the CSEs possessed preformed opinions regarding the student's special education program or placement in the 8:1+4 special class." SRO Dec., p. 35. This completely disregards that the District made this exact same placement recommendation for three straight years despite L.L.'s intensifying needs.

125. This Court should not defer to the SRO's inaccurate holding that the District did not predetermine L.L.'s placement, especially as "[t]he issue of predetermination is not a matter requiring educational expertise." *A.K v. Westhampton Beach Sch. Dist.*, No. 17-CV-0866 (GRB)(SIL), 2021 WL 621236, at *14 (E.D.N.Y. Jan. 6, 2021), *report and recommendation adopted sub nom. Killoran v. Westhampton Beach Sch. Dist.*, No. 2:17-CV-00866, 2021 WL 665277 (E.D.N.Y. Jan. 25, 2021).

126. A CSE's predetermination of a child's IEP can amount to a procedural violation of the IDEA if it deprives the parent of *meaningful* participation in the IEP process. *F.B. v. N.Y.C. Dept. of Educ.,* 132 F. Supp. 3d 522, 538-39 (S.D.N.Y. 2015)(emphasis added). "The core of the [IDEA] is that the development of the IEP be a cooperative process between the parents and the district, and predetermination by a district of a child's IEP undermines the IDEA's fundamental goal to give parents a voice in the educational upbringing of their children." *D.D.-S. v. Southold Union Free Sch. Dist.*, 2011 WL 3919040, at *10 (E.D.N.Y. Sept. 2, 2011).

127. The District's failure to consider program options requested by a parent may constitute predetermination and a FAPE denial, as it deprives a parent of meaningful participation in IEP development. *See E.H. v. N.Y. City Dep't of Educ.*, 164 F.Supp.3d 539, 552-553 (S.D.N.Y. 2016) (CSE predetermined a student's placement where it failed to consider more restrictive options at a parent's request).

128. Further, the SRO mischaracterizes M.R. and G.L.'s predetermination claim, arguing that the District could not be compelled to place L.L. at a non-approved program. SRO Dec., pp. 35-36. In fact, their objection was to the District's refusal to consider *any* program other than its in-District 8:1:4 special class. Tr. 3977-78. M.R. testified that they were willing to consider any placement, and that they had requested ELIJA at the CSE as it was their understanding that this was the only program with an opening at that time. Tr. 4313; *see* Tr. 4249.

129. In addition, the SRO improperly holds that the District did not have to consider alternative placements such as ELIJA as it was required to consider placing L.L. with nondisabled peers. SRO Dec., p. 38. However, where, as here, a student is segregated from mainstream peers, the District cannot seriously argue its program is in the Least Restrictive Environment simply because the special education classroom is housed in a community school. *See D.N. v. Bd. of Educ. of Center Moriches Union Free Sch. Dist.*, 2015 WL 5822226, at *12 (E.D.N.Y. Sept. 28, 2015).

130. L.L. was unable to engage with and participate in classroom activities in his 21-22 SY classroom and would have continued to be isolated in 22-23, making it just as restrictive as a 1:1 placement, albeit without proper ABA. *See* Tr. 2730, 4221. L.L. was not able to form friendships or positive relationships of any sort with his classroom peers. Tr. 3065, 4221.

At best, he eschewed any contact with peers his own age, or non-preferred adults; at worst he threw tantrums rather than interact. Tr. 2991.

131. The April 2022 PWN notes that while L.L.'s parents indicated they were not in agreement, but would consider the recommendations, "the rest of the committee was in agreement." Ex. D, p. 4. That was not accurate: none of the independent evaluators who attended that meeting agreed with the District's proposed placement. Tr. 2736-37, 4044. Ms. Bottalico testified that "there wasn't a general agreement that [the 8:1:4] was an appropriate placement. The committee really took the position that we weren't part of the committee and that our opinions didn't really matter." Tr. 3037.

132. The SRO failed to contend with the District's failure to recognize L.L.'s speech echolalia, and failure to address his speech needs appropriately. *See* SRO Dec., p. 50. Dr. Howard noted that when a child with ASD "learn[s] to speak but they don't necessarily learn the specific foundations of speech, … what happens is a term called splinter skills where they can speak but they don't necessarily know what they're saying or they really struggle to expand upon what they're saying." Tr. 2398-99. This was how L.L. presented when he enrolled at ELIJA. "For example, he could say hi to a peer but if a peer asked, how are you, he was nonresponsive. Even if he was engaged and attending, he didn't know what to say. So sometimes that happens with students that they earn certain aspects of language that's been taught or just acquired but they're missing other aspects of language which then need to be attended to and taught." Tr. 2399.

133. What the District perceived as well-developed speech patterns was really delayed echolalia. "Delayed echolalia is a term describing when children… remember what was said and then they imitate it. They say it. Especially with individuals with autism who have incredible

memories in many cases and ability to recall certain things that are of interest, delayed echolalia shows up." Tr. 2540. "To a novel listener, some of the speech that L.L. would emit appeared very impressive, advanced, specific, and relevant to the situation." Tr. 3714. Upon a deeper examination, however, it became clear that "L.L. was saying the same thing…in the same intonation, in the same context, suggesting that it was rote. It was memorized. It was delayed echolalia. It was not novel thought or application." Tr. 3715.

134. Shannen Gillespie, BCBA, L.L.'s Clinical Supervisor at ELIJA, also testified that L.L.'s speech included a lot of scripting for which he needed intensive support. Tr. 3757, 3781. His limited speech repertoire meant L.L. would disengage or refuse to participate in any conversation about a novel topic, isolating him. Tr. 3715.

135. Overall, the 8:1:4 classroom setting, even with the prescribed related services and home-instruction outlined in the IEP, was completely inappropriate to meet L.L.'s needs and he showed "regression in intellectual, academic, and adaptive functioning while in" that setting. Ex. L, p. 12. L.L. needs both his primary instruction and his related services to be provided through ABA in a 1:1 setting. "[I]t is essential that [L.L.]'s education be approached in an individualized manner and adhere to principles of applied behavior analysis; absent such an approach, L.L. will invariably struggle to engage and make meaningful progress. Relatedly, L.L.'s related services…should be approached from an ABA consultation model to enable him to extract the greatest benefit from such efforts." Ex. L, p. 12. The District failed to recommend that L.L.'s related services be provided in the consult model.

136. In assessing the District's failures as a whole, it is clear that the District failed to offer L.L. a FAPE for the 22-23 SY. *See L.O. v. N.Y. City Dep't of Educ.*, 822 F.3d 95, 124 (2d Cir.

2016). Multiple violations "display[ ] a pattern of indifference to the procedural requirements of the IDEA" in which the District "repeatedly violat[ed] its obligation under the statute, which consequently resulted in the deprivation of important educational benefits to which [the student] was entitled by law." *Id*.

137. The SRO erred by ignoring and/or glossing over the significant testimony and evidence demonstrating that the District's IEPs and program recommendations would not have been appropriate for L.L., and should be reversed.

138. The SRO erroneously found that the District's IEP was appropriate for L.L. even though it failed to recommend an appropriate class placement, and should be reversed.

139. The SRO erred by ignoring and/or glossing over the testimony and evidence demonstrating that the professionals who evaluated L.L. and worked with him had recommended that he be placed in a one-to-one ABA program, and should be reversed.

140. The SRO erred by ignoring and/or glossing over the testimony and evidence that the District predetermined its placement for L.L., and should be reversed.

141. The SRO erred by ignoring and/or glossing over the testimony and evidence demonstrating that the District's recommended 8:1:4 special class was inappropriate for L.L.'s needs and would cause him to regress, and should be reversed.

142. The SRO erred by ignoring and/or glossing over the testimony and evidence demonstrating that the District failed to develop a timely or appropriate BIP for L.L., in addition to failing to properly conduct an FBA, and should be reversed.

143. Overall, the SRO failed to issue a careful and thorough decision, and thus, it is respectfully submitted that this Court should not defer to the SRO's improper determinations.

144. The record as a whole demonstrates that M.R. and G.L. has met the Prong II burden for tuition reimbursement/funding as ELIJA offered L.L. instruction and supports tailored to his unique needs, and that L.L. progressed meaningfully at ELIJA. The IHO improperly found in the District's favor on Prong II, while the SRO opted not to rule on this issue. IHO Dec., pp. 79-82; SRO Dec., p. 51.

145. Where, as here, the District failed to offer a FAPE, the inquiry turns to whether the unilateral educational program is appropriate. To be "appropriate," the unilateral placement need not be perfect, need not meet each and every one of the child's educational needs, and need not be in the child's least restrictive environment ("LRE"). *See Frank G. v Bd. of Educ*. of Hyde Park, 459 F.3d 356, 364 (2d Cir. 2006).

146. Unfortunately, the IHO ignored the *Frank G*. precedent in her short and conclusory analysis of ELIJA. *See* IHO Dec., pp. 79-82. This includes holding that ELIJA was not appropriate because it did not offer counseling, ignoring that a private school need not meet each one of L.L.'s needs.

147. Review of the private placement "is more informal than review of the original IEP: a private placement need not meet the IDEA requirement for a FAPE." *R.E*., 694 F.3d at 187 n. 3. The main inquiry is whether a placement "provides education instruction specifically designed to meet the unique needs of a handicapped child." *Gagliardo v. Arlington Cent. Sch. Dist*., 489 F.3d 105, 115 (2d Cir. 2007).

148. The IHO inaccurately held that ELIJA did not address L.L.'s academic needs. IHO Dec., p. 79.

149. In fact, ELIJA targeted its instruction to focus on foundational skills that would enable L.L. to meaningfully engage in the educational environment and to function in his home

environment. "ELIJA's priority with our instruction is…on where are his deficits…we wanted to clean all that up and get him really solid in those areas before building on more advanced skills." Tr. 3239-40. Dr. Marks' recommendations support this approach – he recommended that given his profound needs in the area of self-care and self-regulation, L.L. be in a program that would emphasize and embed his activities of daily living into his educational goals, "rather than simply arming him with academic skills." Tr. 2725. Not only was working on these foundational skills appropriate for L.L., but failure to do so on the part of the District was a denial of FAPE. *W.S.,* 188 F. Supp. 3d at 305 (finding FAPE deprivation where an IEP failed to recommend 1:1 ABA instruction and focused instead on academic subjects for a "pre-academic" student). Instruction was tailored to L.L.'s unique needs, rather than a cookie-cutter approach. Although "academic" work had to take a backburner until L.L. was ready and capable of attending in the classroom, as soon as it was appropriate, ELIJA staff added in programs and targets in literacy, including reading early learner books. Tr. 2594; Ex. HH, p. 13. He mastered "a total of 29 targets" in math. Tr. 2595; Ex. HH, p. 13. ELIJA testified that addressing his extreme rigidity on enrollment and his inability to tolerate certain things was something ELIJA tackled right away and that the school tried "right away to teach him to tolerate a lot of different things, which I think is a great skill that we have taught him through this school year, to allow him more… instructional time and more programming time, so there wasn't too much of time spent working through behaviors." Tr. 3782.

150.  When he began at ELIJA, L.L. was demonstrating many of the same maladaptive behaviors he had in District. Tr. 2452. ELIJA had to first work to extinguish these behaviors before being able to move on to more "academic" work. Tr. 2796, 3238-40. When asked why there

weren't more programs initially developed for L.L. around academics such as reading in his first months there, Dr. Howard noted that "he had major skill deficits in areas that precluded him from being able to be with other peers and those took priority." Tr. 3718. Once those critical behavioral needs were addressed, L.L. was able to access more academic programming and it was introduced. *See* Ex. HH.

151.  ELIJA also had to re-teach a number of academic skills that the District asserted he had mastered. For example, he could count to some numbers, but not others. He could count to 5, but couldn't count to 6. Tr. 2520-21. He had been taught in such a rote manner of counting to base numbers, that he came to ELIJA unable to count to a number between them when asked to. Tr. 2520-21. This is just another example of being unable to generalize a skill, and it was a skill that ELIJA successfully retaught. Tr. 2521-22; Ex. S, p. 10.

152.  The IHO also improperly credited District claims that L.L.'s social skills deficits were not addressed at ELIJA. IHO Dec., p. 82. L.L. made progress socially at ELIJA: the 1:1 environment enabled L.L. to begin to make meaningful connections, both in the school setting with same-aged-peers, and with his family and extended family in the home environment. Tr. 4256. Mr. Verini's own CSE notes indicate that ELIJA described L.L.'s success with peers at the August CSE meeting, demonstrating that he was not isolated at ELIJA, and discussed how they would work on his social skills in the face of L.L.'s severe behavioral challenges. Ex. 55, p. 2.

153.  When L.L. first enrolled at ELIJA, he could not function in even a small group of peers. Tr. 2448. He was not able to engage in meaningful relationships with his peers initially. Tr. 2472. However, he was placed in a classroom with an area for joint activities and ELIJA developed programs to help L.L. engage with his peers, which were ultimately successful.

Tr. 2431-32. These programs addressed his hierarchy of peers and the delayed echolalia and perseveration of speech. There were programs developed for both tolerating less-preferred people and for initiating and reciprocating social greetings. Tr. 2531. There was a program for participation in group instruction and Ms. Gillespie testified that L.L. "made great strides during…the year within this program." Tr. 3788-89. All of his programs related to play contained metrics that he had to be able to do the skill, but also "generalization to peers…[which was] very important to make sure that L.L. didn't just do that with his teacher but [that] he can do it with other kids." Tr. 2592. Not only did his target-load increase over the course of the school year, but "he mastered 25 targets across the school year" solely in the domain of relationships and engaging with peers. Tr. 2591; Ex. HH, p. 12.

154.  L.L. has made progress in being able to participate in his home and family and have positive relationships with family members. L.L.'s mother testified that if she was with her two sons alone before ELIJA, she "could not physically stop L.L. at that point from going to attack [his brother], so I just would not keep them together because it was too dangerous." Tr. 4217-19. However, since enrolling at ELIJA, "L.L. is getting along better with his brother. He can be in the same room as his brother." Tr. 4259.

155.  Speech consult services were also appropriate for L.L. due to the severity of his behaviors, and L.L. progressed in his speech skills. L.L. would "continuously say certain statements that sound the same every single day, day after day. When someone says something different, he would often times protest and would tell the adult what he wanted them to say." Tr. 2542. ELIJA targeted this problem throughout his programming, because "it became debilitating" if the script wasn't followed. Tr. 2543. ELIJA's natural environment teaching in conjunction with discrete trials and consultation from the speech therapist

addressed this extreme scripting and behaviors that resulted from anyone going off-script. *See* Ex. HH, pp. 18-20. The IHO inaccurately claimed that private evaluations from the Parents recommended direct services rather than consult services, but neither report referenced mentions whether consult or direct services would be appropriate. Exs. 15, 17; IHO Dec., p. 81.

156. In fact, it was with speech consult services that L.L. made some of his most significant progress. He moved from mostly scripted speech to being able to engage in spontaneous speech. Tr. 2583; Exs. S, p. 13; HH, p. 19. The data collected bore that out by noting longer response times between question and answer. Ex. HH, p. 19. That meant "if L.L. was put in a novel situation and asked a question that was novel…the time it took for him to respond increased…it showed that he was processing the information and coming up with that response" rather than drawing on his bank of scripted responses. Tr. 2611; Ex. HH, p. 19.

157. His conversation skills also improved, with his third trimester progress report noting that "L.L. has demonstrated significant improvements with eye contact when requesting items, greeting adults and peers and while engaging in reciprocal conversations." Tr. 2612. His aggression and frustration tolerance also improved dramatically. By mid-May, "aggression towards adults reduced to zero consistently…the positive practice procedure…worked and started to teach L.L. alternatives to being in these frustrating situations and using language to communicate as well as his new toleration skills instead of hitting adults." Tr. 2864. The school "fairly stable reductions across a majority of L.L.'s problem behaviors. There were still some occurrences in some of the problem behavior that needed finer intervention, but overall, when looking at the data sets, pre and post the positive practice intervention, favorable results were shown, not only in the decrease of the problem behaviors but also

40

the emergence through mostly the direct observation of language replacing those problem behaviors, positive language and acceptable language." Tr. 3711.

158. These programs targeted his rigidity, in speech in particular, but across all domains. Before, "he wouldn't tolerate no." Tr. 4259. Now, if his mother says no to a request, "he might ask again, but he tolerated it. It's not a tantrum. It's not a meltdown…he's less rigid overall." Tr. 4259-60. In the domain of speech, his communication has improved dramatically - "he's able to have a conversation, he's interested in people…he wants to talk to people." Tr. 4260. Dr. Burkhard noted that as soon as October 29th of 2022, when she met with L.L., "his behavior had improved [and]…he seemed a little more able to communicate." Tr. 4045-46.

159. L.L. also mastered 22 fine motor targets and many gross motor targets as well, belying the IHO's claim that ELIJA did not support his motor skills needs. Tr. 3804-05; Ex. HH, p. 7; IHO Dec., p. 82.

160. Overall, the IHO failed to contend with the programming ELIJA was offering and how it addressed L.L.'s unique needs as a learner, and her decision should be reversed.

161. The record as whole demonstrated that M.R. and G.L. cooperated with the District such that equities weigh in M.R. and G.L. and L.L.'s favor.

162. Generally, "[i]n the absence of evidence demonstrating obstructive conduct on the part of parents, equitable considerations militate in favor of an award of relief to parents who have been denied their rights under the IDEA." *I.B. v N.Y. City Dep't of Educ.*, 2016 WL 1069679, at *18 (Mar. 17, 2016); *M.H.*, 685 F.3d at 254 (finding equitable considerations favored the parents where they "cooperated with the CSE[,]...provided private evaluations, participated in the IEP meeting, visited the proposed placement and provided timely notice of their intent to place the student in a private school"). L.L.'s parents have always been

open-minded to considering the District's recommendations. Tr. 4249. They have attended numerous lengthy CSE meetings, provided any documents the District requested, and cooperated with the District at every level. Tr. 4278. L.L.'s parents provided timely and proper notice to the District of their concerns and claims, and their intent to pursue tuition reimbursement subject to appropriate recommendations from the District. Ex. Y. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I).

163.    The IHO vaguely claims that the Parents "did not always communicate their concerns" with the District, but the only concern specifically noted is with the home provider's failure to provide all home services. IHO Dec., pp. 76, 82. L.L.'s mother "was under the impression that the District knew" (Tr. 4282) about the frequent missed sessions, as they received the provider's timesheets. Tr. 4283-4288. It was only when the disclosure packet for the instant hearing was provided that they learned the provider had forged many of the parents' signatures on her time sheets, defrauding the district and claiming to have worked many, many hours that she didn't. Tr. 4283-4288. L.L.'s parents were concerned enough about the forgeries that they filed a police report, but this was not done until after the hearing began and they could not have informed the District before receiving those exhibits. *See* Tr. 4288; IHO Dec., p. 76.

164.    The IHO's ruling was based solely on this vague claim, and failed to analyze the extensive efforts of the Parents to cooperate with the District, and must be reversed. The SRO failed to reach this issue in his decision.

## **RELIEF SOUGHT**

**WHEREFORE,** Plaintiff respectfully requests that this Court:

    (a)    Reverse the June 20, 2025, SRO Decision it its entirety;

(b)     reverse the October 29, 2024, IHO Decision;

(c)     declare that the District denied L.L. a FAPE for the 2022-2023 school year; that L.L.'s parents have met the applicable Second Circuit standards for reimbursement of unilaterally provided tuition and special education services for L.L. for the 2022-2023 school year; and that the equities favor L.L. and his parents;

(d)     order the District to reimburse M.R. and G.L. for L.L.'s program at the ELIJA for the 2022-2023 school year;

(e)     declare L.L. and his parents to be the "prevailing party" for purposes of the IDEA's fee-shifting provision;

(f)     grant leave to Plaintiff's counsel to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs at the administrative impartial hearing level, the SRO level, and in this action, pursuant to the IDEA's fee-shifting provisions; and

(g)     grant Plaintiff such other, further, and different relief as may be just under the circumstances.


Dated: Huntington, New York
        October 15, 2025

                                                    /s/
                                                    _____
                                                    Christina D. Thivierge (CT 9565)
                                                    Thivierge & Rothberg, P.C.
                                                    Attorneys for the Plaintiff
                                                    22 High Street
                                                    Huntington, New York 11743
                                                    Tel: (212) 397-6360
                                                    Fax: (212) 397-6361

*christina@trspecialedlaw.com*